UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

LYONS CAPITAL, INCORPORATED, a/k/a
Isip of America Financial
Corporation, a/k/a Lyons Mortgage
Brokers Corporation,
*Defendant-Appellant.*

No. 99-4178

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

OTTO VON BRESSENSDORF, a/k/a
Ottone Eugeno "Ottone Eugeno
Camelio Bresselhau", a/k/a Baron
Otto Von Bressensdorf, a/k/a Baron,
*Defendant-Appellant.*

No. 99-4179

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

ELENA VON BRESSENSDORF, a/k/a
Elena Bisheff, a/k/a Baroness,
*Defendant-Appellant.*

No. 99-4180

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.                                              No. 99-4193

BARBARA LICHTENBERG, a/k/a Barbara
Lichtenberg-Cooke,
          *Defendant-Appellant.*

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, District Judge.
(CR-98-14)

Argued: October 31, 2000

Decided: December 7, 2000

Before WILKINSON, Chief Judge, and NIEMEYER and
MOTZ, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**COUNSEL**

**ARGUED:** Robert James Wagner, WAGNER & WAGNER, Rich-
mond, Virginia; Christopher Ford Cowan, COWAN, NORTH &
LAFRATTA, L.L.P., Richmond, Virginia; Kathleen Spear Rice,
BERLINER, CORCORAN & ROWE, Washington, D.C., for Appel-
lants. James Brien Comey, Jr., Assistant United States Attorney,
Richmond, Virginia, for Appellee. **ON BRIEF:** Thomas G. Corcoran,
Jr., BERLINER, CORCORAN & ROWE, Washington, D.C.; James
J. Harney, DUVALL, HARRIGAN, HALE & DOWNEY, Fairfax,
Virginia, for Appellant Lichtenberg; Stanley W. Preston, Jr., PRES-
TON LAW FIRM, Richmond, Virginia, for Appellant Lyons Capital.

Helen F. Fahey, United States Attorney, Richmond, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

In this case a jury convicted three individuals and a corporation of conspiracy to commit mail fraud, multiple counts of mail and wire fraud, and related charges. They appeal, challenging their convictions and sentences on numerous grounds. Finding no reversible error, we affirm in all respects.

### I.

Over the past two decades, Lyons Capitol, Inc., Otto Von Bressendorf, Elena Von Bressendorf, and Barbara Lichtenberg (collectively "the conspirators") engaged in a scheme to defraud clients by convincing them to pay thousands of dollars in "advance fees" and providing almost nothing in return. Ostensibly, Lyons is an investment banking firm that specializes in helping promising businesses find financial backing through the private placement of securities and joint venture partnerships.

In reality, however, Lyons rarely helped clients at all. Instead, through mailings, websites, unsolicited e-mail, videotapes, and other means, Lyons attracted mostly nascent companies and individual entrepreneurs seeking venture capitol. After interested parties contacted Lyons and provided a brief outline of their project, Lyons employees — often Otto Von Bressendorf — then "screened" the proposals for those with promise and scheduled an initial meeting with potential clients. Typically, at those meetings, Otto Von Bressendorf, surrounded by military medals and various other "honors" and

"awards," fraudulently told clients that he was a "baron" of German nobility with extensive connections to the European financial community. Clients were also misled to believe that Lyons had an expansive international investor network, a seventy percent success rate in finding funding for its clients, and had never been the subject of a complaint or lawsuit.

In addition to the above misrepresentations, the conspirators hired various individuals to write "reference" letters to potential clients falsely testifying to Lyons's successes. Lyons also provided fraudulent financial statements to Dunn & Bradstreet, which in turn produced a commercial credit rating that potential clients used in deciding whether to engage Lyons.

Because of the fraudulent misrepresentations by the conspirators, hundreds of clients paid thousands of dollars in advance fees for "legal, underwriting, and marketing expenses." The conspirators promised that they would use their expertise to help clients create offering memoranda that would in turn help them get funded from Lyons's vast network of international investors; they explained that this process would take approximately 90-180 days. However, the initial memoranda, if completed at all, were rarely finished within a year. The conspirators blamed delays on "particularly uncooperative clients," when, in fact, they — often Lichtenberg — purposefully frustrated and prolonged the underwriting process. Because of the frustration and delay, many clients gave up without having received anything of value from Lyons. Even clients that completed an offering memorandum failed to obtain funding for their projects. Indeed, no former clients testified that Lyons helped them obtain funding.

Following an FBI investigation, the Von Bressendorfs, Lichtenberg, and the corporation were charged and convicted of numerous counts of mail fraud, 18 U.S.C. § 1341 (1994), and wire fraud, 18 U.S.C. § 1343 (1994), and of one count of conspiracy to commit fraud, 18 U.S.C. § 371 (1994); the Von Bressendorfs and Lyons were also convicted of money laundering, 18 U.S.C. § 1956 (Supp. II 1996).

## II.

The conspirators' first challenge is to the sufficiency of the evidence. "If there is substantial evidence to support the verdict, after

viewing all of the evidence and the inferences therefrom in the light most favorable to the Government, then we must affirm." *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994).

A.

The Von Bressendorfs and Lyons contend that the evidence failed to prove anything beyond "seller's talk" or "puffery" and did not establish material misrepresentations intended to defraud. Our close review of the record reveals that the government in fact proffered sufficient evidence to prove that they made many material misrepresentations from which the jury was entitled to conclude they intended to defraud their clients.

Their arguments to the contrary simply constitute attempts to relitigate issues decided at trial by the jury. For example, Otto Von Bressendorf asserts that the government failed to demonstrate that he lied about his ancestry and his foreign investment contacts. This argument, however, amounts to nothing more than an attack on the credibility of a government witness who testified that, upon investigation, he found nothing in the Austrian archives to support Von Bressendorf's claim that he was given the title "Baron." We "do not weigh the evidence or review the credibility of witnesses in resolving the issue of substantial evidence." *United States v. Saunders*, 886 F.2d 56, 60 (4th Cir. 1989) (quoting *United States v. Arrington*, 719 F.2d 701, 704 (4th Cir. 1983)).

Similarly, the conspirators assert that the government failed to prove that Lyons had less than a seventy percent success rate because the government produced *only* sixteen former clients to testify that Lyons failed them. Those sixteen witnesses assertedly comprised less than three — not seventy — percent of the projects that the company accepted over the years. This argument also fails. The FBI obtained, and the government introduced at trial, a list of 209 Lyons projects between February 1992 and September 1997, none of which produced funds for Lyons's clients. Moreover, despite testimony from sixteen clients regarding Lyons's misrepresentations and failures, the conspirators failed to produce even one satisfied customer. It would hardly have been irrational for the jury to conclude that the conspirators misrepresented Lyons's past successes.

Lichtenberg argues separately that the evidence fails to support her conviction for mail fraud, either as a principal or an aider and abettor. As with the other conspirators, the jury was entitled to convict Lichtenberg on the evidence adduced at trial. Contrary to her claims, the government produced evidence that she lied about the success rate of the company, lied about being an attorney, and frustrated clients' attempts to complete the underwriting process, thereby contributing to the failure of many projects. The record reveals ample evidence that Lichtenberg was an integral and willing participant in the scheme to defraud.

B.

The conspirators also contend that the evidence was insufficient to sustain a conviction for conspiracy to commit fraud in violation of 18 U.S.C. § 371 (1994). First, they contest the sufficiency of the evidence to establish an agreement between the parties. Relying on our decision in *United States v. Giunta*, 925 F.2d 758, 766 (4th Cir. 1991), they maintain that we apply "heightened vigilance" to sufficiency claims in conspiracy cases. They fail to acknowledge, however, that we explicitly overruled *Giunta*'s "heightened vigilance" analysis in *United States v. Burgos*, 94 F.3d 849, 859-60 (4th Cir. 1996) (en banc). Although in this case the government produced no direct evidence of an agreement to commit mail fraud, "a conspiracy may be proved wholly by circumstantial evidence." *Burgos*, 94 F.3d at 858. The government offered evidence from which a rational jury could infer beyond a reasonable doubt that the Von Bressendorfs and Lichtenberg jointly conspired to commit fraud. Indeed, their relationship, length of association, and similar attitude and conduct — e.g., lying about the success of the company — all point to the existence of a conspiracy. *See id.* (listing factors tending to prove a conspiracy); *United States v. Collazo*, 732 F.2d 1200, 1205 (4th Cir. 1984).

The conspirators' second argument regarding § 371 is equally unavailing. That statute punishes those that "conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose." 18 U.S.C. § 371. The conspirators contend that "there was absolutely no evidence, either direct or indirect, of an agreement between the appellants to defraud the United States." To be sure, there is no evidence

that they agreed to *defraud* the United States, but the government produced ample evidence to prove that they agreed to *commit an offense* — wire fraud in violation of § 1343 and mail fraud in violation of § 1341 — against the United States. Such evidence suffices to prove a violation of § 371. *See United States v. Ellis*, 121 F.3d 908, 913 (4th Cir. 1997) ("§ 371 extends generally to cover any offense made illegal by federal law.").

### C.

In addition, the Von Bressendorfs and Lyons contend that the evidence was insufficient to prove money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) because the government purportedly did not prove the use of illegal proceeds to "commit the next step in the alleged scheme." This argument too is meritless.

Section 1956 does not require proof that a defendant used illegally obtained money to commit the "next step" in the scheme. Rather, the government must demonstrate only that a defendant "conducts or attempts to conduct such a financial transaction . . . with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A)(i). The government produced ample evidence to support that conclusion. Indeed, the Von Bressendorfs stipulated that advance fees were used to pay the bills and "promote and carry on the business" — a fraudulent business. Thus, their reliance on *United States v. Heaps*, 39 F.3d 479 (4th Cir. 1994), is misplaced. In *Heaps*, we reversed a money laundering conviction because the defendants used drug proceeds to pay for drugs previously obtained on credit. In other words, the money was used to complete a past transaction, not to further future illegal activity. *Heaps*, 39 F.3d at 484-86. There was no evidence in that case that the money was "itself used to promote an unlawful activity." *Id.* at 486. In contrast, here the Von Bressendorfs concede that the money they obtained from clients — money that a jury found was obtained fraudulently — was used to further their business.

### III.

In addition to contesting the sufficiency of the evidence, the conspirators also argue that prosecutorial misconduct occurred through-

out the trial, which entitled them to a mistrial. Our test for prosecutorial misconduct "generally has two components: that (1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993) (internal quotations omitted). *See also United States v. Wilson*, 135 F.3d 291, 297 (4th Cir. 1998).

The conspirators assert that the prosecutors engaged in misconduct on a number of occasions. For example, they argue that the government's characterization of Lyons's business as a "con game, cheat, a scam, a flim flam" during opening statement amounted to prejudicial misconduct. These statements, however, reflect an accurate depiction of what the government set out to prove; judging from the jury verdict, the government succeeded.

The conspirators also object to the prosecution's redirect examination of one of the attorneys who wrote "reference" letters to potential clients; the prosecutor inquired whether the witness was currently under indictment for securities fraud in another jurisdiction. Defense counsel objected, the trial judge sustained the objection, and then instructed the jury to disregard the question. We fail to see any prejudice. We presume that jurors follow instructions from the judge. *See United States v. Olano*, 507 U.S. 725, 740 (1993). Moreover, we cannot conclude that this one isolated question in a nine-day criminal trial, in which the prosecution introduced ample evidence to support the jury's verdict, misled the jury or prejudiced any defendant.

Similarly, the conspirators claim that the prosecutors often referred to Lyons's "zero" success rate despite testimony as to at least *one* closed deal. Again, even if the prosecution statements were improper — and we do not hold that they were — this small discrepancy did not prejudicially affect any of defendant's substantial rights.

Finally, the conspirators argue that the prosecutors asked improper and misleading questions regarding the application of securities laws. The gist of the questions at issue was whether "marketing" and "posting" of private placements (mostly preferred stock offerings) through the Internet would violate securities laws. The conspirators claim that

no factual predicate supported these questions because there was no evidence that private placement postings or marketing appeared on the Internet. But contrary to their assertions, Lyons's website advertised private placements and gave explicit instructions about how to initiate a private placement project with Lyons. The website also contained several pages listing current projects without disclosing whether they were private placement or joint venture projects. In addition, while the conspirators may not have violated the law by failing to secure a securities license, the government argued that their lack of licensure demonstrated that they were not serious about helping their clients obtain funding; otherwise, they would have been licensed to handle securities offerings in the United States.

Moreover, even if these questions had lacked a factual predicate, the conspirators provide no persuasive argument on which to base a finding that these questions deprived them of a fair trial. These questions comprised an extremely small portion of the trial in which, as discussed above, there was ample evidence to sustain the verdict. *See United States v. Harrison*, 716 F.2d 1050, 1052 (4th Cir. 1983) (explaining that the extent of the remarks and strength of other proof are to be considered in the prosecutorial misconduct calculation).[1] Accordingly, we find no prosecutorial misconduct requiring the trial judge to order a mistrial.

## IV.

The conspirators also claim that the district court committed a number of trial errors.

## A.

First, they contend that the trial judge erred by making a biased comment in front of the jury and subsequently failing to grant a mistrial due to that comment. We review for abuse of discretion both a claim of bias in the conduct of a trial, *United States v. Castner*, 50 F.3d 1267, 1272 (4th Cir. 1995), and a trial court's refusal to declare

---

[1]Lichtenberg makes separate claims of prosecutorial misconduct that amount to nothing more than additional sufficiency of the evidence claims that are as meritless as those discussed above.

a mistrial. *United States v. Dorlouis*, 107 F.3d 248, 257 (4th Cir. 1997).

During the examination of a government witness, the district court asked the prosecutor to identify the number of the exhibit being shown the witness. The judge explained that he wanted the exhibit number on the record because "it won't be me, I will be long gone when this case is being considered by the Court of Appeals and they want to be able to look at [the exhibit]." The conspirators immediately objected to the use of "the Court of Appeals" and moved for a mistrial, which the district court denied. They argue that the judge abused his discretion in refusing to grant a mistrial, asserting that the comment expressed his belief that they would be convicted and subsequently appeal.

The trial judge's statement could not have prejudiced the jury unless the jurors knew that only a criminal defendant — and not the government — has an absolute right to appeal. *See United States v. Martin Linen Supply Co.*, 430 U.S. 564, 568 (1977).[2] Moreover, the judge's comment in this case was one short, insignificant remark in a nine-day trial. *Cf. United States v. Fuller*, 162 F.3d 256 (4th Cir. 1998) (upholding a conviction despite a far more prejudicial judicial comment). Finally, the judge gave an appropriate curative instruction. By his comment, the trial judge did not express his views about the credibility of witness testimony, *cf. Quercia v. United States*, 289 U.S. 466, 471-72 (1933); *Fuller*, 162 F.3d at 260, or add to the conspirators' burden of proof, *Bihn v. United States*, 328 U.S. 633, 637 (1946). Rather, the district judge made an inconsequential and innocent remark that he later cured with an appropriate instruction. Neither his comment nor his refusal to grant a mistrial constitutes an abuse of discretion.

B.

According to the government, the conspirators furthered their "scheme to defraud" by paying individuals to write "reference" letters

---

[2]In fact, a defense attorney conceded at oral argument that it would be a "stretch" to think that most jurors are aware of that rather counterintuitive fact.

to prospective clients expounding upon, among other things, Lyons's past successes. During the testimony of a "reference" attorney, the prosecutor asked where he obtained his knowledge of these "successes." The attorney replied that his knowledge came from Otto Von Bressendorf, at which time defense counsel objected on grounds of attorney-client privilege. The trial judge overruled that objection, and Lyons Capital and the Von Bressendorfs now appeal that ruling. We review determinations as to the existence of attorney-client privilege for clear error. *United States v. Aramony*, 88 F.3d 1369, 1389 (4th Cir. 1996).

Communications between attorney and client are privileged only if the client "intended [the information] to be kept confidential." *In re Grand Jury Proceedings*, 727 F.2d 1352, 1355 (4th Cir. 1984). It is clear from the nature of the communication between Otto Von Bressendorf and the "reference" attorney, that Von Bressendorf did not intend to keep this information confidential, but rather fully expected the attorney to share the "successes" of his company with potential clients as a means of attracting new business. Accordingly, the district court did not err in overruling the objection.

## C.

The conspirators also assert that the district court erred in several evidentiary rulings. We review such decisions for abuse of discretion. *United States v. Ward*, 171 F.3d 188, 195 (4th Cir.), *cert. denied*, 120 S.Ct. 137 (1999).

### 1.

Prior to trial, the defense deposed a German newspaper editor, who testified that one of his reporters investigated Otto Von Bressendorf's background and determined that he was indeed a baron. The government objected on hearsay grounds to the introduction of this deposition at trial; the district judge sustained the objection. The conspirators claim that this was in error because the Federal Rules of Criminal Procedure allow the use of "a deposition, so far as otherwise admissible under the rules of evidence." Fed R. Crim. P. 15(e). They contend that the deposition is "otherwise admissible" under Rules 804(b)(1) and 803(19) of the Federal Rules of Evidence. Rule

804(b)(1) allows the admission of former testimony if the declarant is unavailable - which he was in this case — and Rule 803(19) permits testimony, which would otherwise be hearsay, regarding:

> Reputation among members of a person's family by blood, adoption, or marriage, or among a person's associates, or *in the community*, concerning a person's birth, adoption, marriage, divorce, death, legitimacy, relationship by blood, adoption, or marriage, *ancestry, or other similar fact of personal or family history*.

Fed. R. Evid. 803(19) (emphasis added).

The conspirators argue that the editor's statement should have been admitted because it concerned Otto Von Bressendorf's "reputation . . . in the community" regarding his "ancestry" and "family history." But no record evidence demonstrates that the editor's information was based on Otto Von Bressendorf's "reputation . . . in the community." The editor simply testified that his reporter told him this following an unspecified background investigation. During deposition, the editor admitted that he did not know where the reporter obtained his information. *See* 31 Michael Graham, Federal Practice and Procedure: Evidence § 6770 (Interim ed. 1997) ("The witness called to testify to such reputation must be shown to . . . *be familiar with the reputation*.") (emphasis added).

Even if the defense had offered proof that the editor's testimony stated facts based on Von Bressendorf's "reputation . . . in the community" it was inadmissible. The Advisory Committee Note to Section 803(19) provides:

> Trustworthiness in reputation evidence is found "when the topic is such that the facts are likely to have been inquired about and that persons having personal knowledge have disclosed facts which have thus been *discussed in the community; and thus the community's conclusion, if any has been formed, is likely to be a trustworthy one*." 5 Wigmore § 1580, p. 444, and see also § 1583.

Fed. R. Evid. 803(19) advisory committee's note (emphasis added). Moreover, as the Third Circuit recently held, "reputation testimony arises from sufficient inquiry and discussion among persons with personal knowledge of the matter to constitute a trustworthy 'reputation.'" *Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 100 (3d Cir. 1999). The defense offered no evidence that Otto Von Bressendorf had a *trustworthy* reputation in his community as a baron, or otherwise. In fact, when presented at deposition with two documents disputing Otto Von Bressendorf's claim to nobility, the editor readily admitted that "my doubts grow."

In sum, the district court's decision to exclude the deposition hardly constituted an abuse of discretion.

2.

The conspirators also contend that the district court erred in admitting testimony of an IRS agent regarding Lyons's federal income tax returns and internal financial statements. They assert that this testimony was both irrelevant and violated Federal Rule of Evidence 404(b) because it impermissibly introduced evidence of prior bad acts to prove their "criminal propensity." These arguments have no merit. This evidence was highly relevant and "admissible to prove involvement in the charged [offense] and not simply to prove similar acts." *United States v. Dozie*, 27 F.3d 95, 97 (4th Cir. 1994).

The government elicited the agent's testimony to demonstrate that Lyons's financial statements were "grossly overstated" when compared to its tax returns. Lyons provided these overstated statements to Dunn & Bradstreet as the basis for assigning a "rating" to Lyons. Dunn & Bradstreet in turn provided its ratings to potential clients, who consulted the ratings in deciding whether to employ Lyons's "services." Therefore, the financial overstatements were relevant and furthered the scheme to defraud. The testimony also tended to prove that the conspirators falsely told clients that the advance fees were required to cover "legal, underwriting, and marketing expenses." In fact, according to this testimony, fees paid to Lyons were often used for the Von Bressendorfs' personal expenses.

In sum, the challenged testimony provided "direct evidence of the scheme to defraud." *United States v. Loayza*, 107 F.3d 257, 264 (4th Cir. 1997).

D.

Defendants assert that the district court erroneously instructed the jury with regard to the element of "materiality" under the mail and wire fraud statutes. 18 U.S.C. §§ 1341, 1343. Conviction under § 1341 and § 1343 requires a fact finder to determine that a "scheme to defraud" involved "material" — as opposed to inconsequential — falsehoods. *Neder v. United States*, 119 S.Ct. 1827, 1839-41 (1999). Although the conspirators concede that the district court instructed the jury as to materiality, they nonetheless maintain that a subsequent "misinstruction" was "tantamount to a failure to instruct the jury on materiality."

The challenged instruction stated "that it is not a defense to the charge that the alleged victim or victims were gullible or that a reasonably prudent person would not have been deceived." This instruction correctly stated the law that victim gullibility does not exculpate the defendants. *See Neder*, 119 S.Ct. at 1841 (requiring proof of actual reliance would "clearly be inconsistent with the [mail and wire fraud] statutes"); *see also United States v. Colton*, 2000 WL 1648877 *10 (4th Cir. Nov. 3, 2000) ("If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts.") (quoting *United States v. Brien*, 617 F.2d 299, 311 (1st Cir. 1980)). Thus we find no error.

E.

The conspirators also appeal the district court's failure to instruct the jury that they were not required to obtain a SEC license. "A district court's refusal to provide an instruction requested by a defendant constitutes reversible error only if the instruction: (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to

conduct his defense." *United States v. Lewis*, 53 F.3d 29, 33 (1995) (quotations omitted).

We are unable to determine if the proposed instruction was correct, because the record contains no proposed instruction. And while the court did not "substantially cover" the issue in its charge to the jury, the "failure to give the requested instruction" did not "seriously impair" the conspirators' ability to conduct their defense.[3] The securities issue consumed a minuscule portion of the trial, and the government's closing statement contained only one passing mention of the lack of a securities license. Accordingly, we do not find that the absence of this jury instruction warrants reversal.

## V.

Finally, the conspirators challenge their sentences on several grounds.

## A.

Lichtenberg raises two Sentencing Guidelines issues. We review the district court's legal interpretations of the Sentencing Guidelines de novo, but review factual findings for clear error. *United States v. Jones*, 31 F.3d 1304, 1315 (4th Cir. 1994).

She appeals the two-level enhancement imposed for her use of a "special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Lichtenberg argues that the district court found her special skill to be the ability to "dupe" people, which is "included in the base offense level," of her fraud convictions. She claims that the sentence therefore violates U.S.S.G. § 3B1.3, which provides that the "adjustment may not be employed if . . . [the] skill is included in the base offense level."

---

[3]In this case, it is even unclear whether the trial judge "refused" the jury instruction. The available record reflects that the prosecutors acceded to the jury instruction, but for unknown reasons the judge failed to give such an instruction. Moreover, because Defendants failed to object to the absence of this instruction when asked by the judge if there were any objections, we review this question for plain error.

In fact, the sentencing court clearly found that Lichtenberg's skill was more than the mere ability to "dupe" clients. The sentencing court reasoned:

> [T]he record is that she possessed sufficient indicia and knowledge of legal requirements of the underwriting process to successfully dupe many people, including some lawyers, into believing she was an expert in the area, and these people relied on her advice and expertise in preparing offering memoranda.

Indeed, the court found that Lichtenberg's "underwriting expertise here is not a skill possessed by members of the general public. So she, in fact, had a special skill." Lichtenberg employed her special skill and knowledge to defraud Lyons's clients and thus properly received the § 3B1.3 enhancement.

Lichtenberg also challenges the 14-level increase that the judge applied because the fraud caused a loss that exceeded $5 million. *See* U.S.S.G. § 2F1.1(b)(1)(O). She argues that the district court erred by attributing all losses to her conduct. But the district court specifically found that Lichtenberg "was so intimately involved in the operations and in effectuating the frauds that were the business of this company that it would defy reality to believe that she shouldn't be held accountable under the reasonably foreseeable standard that applies to determine what losses she is to be held accountable for." The sentencing court also noted that even if Lichtenberg could not be held responsible for *all* of the $9.9 million in losses, she was certainly responsible for at least $5 million of the losses, and thus deserved the 14-level increase.

### B.

Finally, the conspirators assert that restitution ordered pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, 3664 (Supp. II 1996), violated the Ex Post Facto Clause. The MVRA applies to post-1996 convictions, 18 U.S.C. § 2249 (statutory notes), and does not require the sentencing court to consider the defendant's ability to pay restitution. *See* 18 U.S.C. § 3663A(a)(1). The MVRA amended the Victim and Witness Protection Act

("VWPA"), 18 U.S.C. § 3664(a) (Supp. II 1990), which, by contrast, did require the sentencing court to consider the defendant's ability to pay when ordering restitution. The conspirators argue that applying the MVRA to conduct that occurred before 1996 disadvantaged them and increased the severity of their punishment in violation of the Ex Post Facto Clause.

Although several circuits have held that application of the MVRA to criminal conduct committed before its enactment violates the Ex Post Facto Clause, *see, e.g.*, *United States v. Edwards*, 162 F.3d 87, 92 (3d Cir. 1998); *United States v. Siegel*, 153 F.3d 1256, 1260 (11th Cir. 1998); *United States v. Williams*, 128 F.3d 1239, 1241 (8th Cir. 1997); *United States v. Baggett*, 125 F.3d 1319, 1322 (9th Cir. 1997); *United States v. Thompson*, 113 F.3d 13, 15 n.1 (2d Cir. 1997), we have not yet decided the issue. *See United States v. Karam*, 201 F.3d 320, 330 & n.13 (4th Cir. 2000). Nor need we do so in this case.

This is so because all of the presentence reports in this case contain sections regarding the conspirators' "Ability to Pay" and explicit information regarding their income and assets. The district judge not only adopted the presentence reports, he also addressed the conspirators' available income and assets, and appointed a Trustee/Special Master to provide, inter alia, "a statement as to the amount of money available for making restitution." We have made clear that "a sentencing court satisfies its duty [under the VWPA] to make specific findings if it adopts a presentence report 'that contains adequate factual findings to allow effective appellate review of the fine or restitution.'" *Id.* at 329 (quoting *United States v. Castner*, 50 F.3d 1267, 1277 (4th Cir. 1995)). *See also United States v. Dawkins*, 202 F.3d 711, 716 (4th Cir. 2000) (upholding restitution order because the court "adopted the proposed findings of the presentence report, which contained a section concerning Dawkins' financial condition"). *Cf. United States v. Ubakanma*, 215 F.3d 421, 428 n.7 & 429 (4th Cir. 2000) (vacating and remanding a restitution order in part because the presentence report made no recommendation as to restitution).

Accordingly, the conspirators' ex post facto claim fails.[4]

---

[4]The conspirators also raise an ineffective assistance of counsel claim, but because it does not "conclusively appear" from the record that they

## VI.

In sum, we have carefully reviewed the record and the arguments of all the parties and affirm the conspirators' convictions and sentences in all respects.

*AFFIRMED*

---

received constitutionally ineffective assistance, their claims must be raised "in the district court by a collateral challenge pursuant to 28 U.S.C. § 2255, rather than in the appellate court by direct appeal." *United States v. Smith*, 62 F.3d 641, 651 (4th Cir. 1995).