PUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                         No. 97-4132

FRANK FULLER,
Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina, at Orangeburg.
Charles E. Simons, Jr., Senior District Judge.
(CR-96-498-CES)

Argued: June 5, 1998

Decided: November 17, 1998

Before NIEMEYER and LUTTIG, Circuit Judges, and
SMITH, United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Smith joined. Judge Luttig wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** John William Weeks, Aiken, South Carolina, for Appel-
lant. Scarlett Anne Wilson, Assistant United States Attorney, Colum-
bia, South Carolina, for Appellee. **ON BRIEF:** J. Rene Josey, United
States Attorney, John M. Barton, Assistant United States Attorney,
Columbia, South Carolina, for Appellee.

_____

**OPINION**

NIEMEYER, Circuit Judge:

During the trial of Frank Fuller on charges of distributing crack cocaine in violation of 21 U.S.C. § 841(a), the district judge explained to the jury that while they "must not accept[his] view of the evidence" and the determination of what the evidence established was entirely up to them, he believed that Fuller was"acting illegally as a drug dealer." Fuller contends that these comments and other erroneous jury instructions are reversible error and entitle him to a new trial.

While we do not approve of the practice of a trial judge's expressing an opinion about a defendant's guilt or innocence, in the exceptional circumstances of this case, we affirm.

I

In January 1996, the FBI office in Columbia, South Carolina, received a complaint from the owner of Angler's Mini-Mart in Vance, South Carolina, that Vance's mayor, Frank Fuller, was attempting to sell drugs in and around the store and was attempting to enlist the store's employees to sell drugs on his behalf. Vance is a small town in Orangeburg County about 75 miles southeast of Columbia, with a population of 214. The town has two paid employees, a police chief and one police officer. Fuller, the town's elected mayor since 1991, serves without compensation. The town's only source of income is through "police funding."

Through a sting operation organized by the FBI with the cooperation of Paula Varner, the manager of Angler's, Fuller was videotaped selling crack cocaine to Varner on four separate occasions in March and April 1996. The total amount of crack that Fuller sold during these transactions was approximately 34 grams. Fuller was arrested and charged in four counts for distributing controlled substances in violation of 21 U.S.C. § 841(a)(1).

Fuller did not deny selling the crack cocaine to Varner. Rather, he claimed that he had sold the drugs to Varner as part of his own inves-

tigation into employee theft and drug use at the mini-mart. Fuller stated that he often frequented Angler's Mini-Mart to drink coffee and "to develop a mayor relationship and make sure Angler's was serving the people well, and that the management and, you know, everything was in order." He claimed that he undertook the investigation of the mini-mart because employees were being fired and because of "problems that's going around in Vance consisting of drugs." He explained that he had supplied Varner with crack cocaine "[b]ecause of the process of the money being missing out of the drawers, and cashiers being released. You know, the cashier was being released because of the money shortage and of inventory," and presumably Fuller concluded that he would catch Varner taking money from the drawer to pay him for the drugs.

To conduct this investigation, Fuller stated that he obtained crack cocaine from "an informant" but that he did not investigate the informant's source of the cocaine because that would be"out of the jurisdiction of Vance." He explained that he "had some informants planted around the store so [he] could get the information of what was going in and out of the store," and he did everything to "get a friendly relationship [with Varner] to make her believe that I was a drug dealer." He asserted that he deliberately attempted to have his dealings with Varner recorded by the store's security system in order to "have concrete evidence" against her and "because my word against hers is not good."

When asked why he had decided to conduct the investigation himself, Fuller testified that he "was displeased" with the services of his chief of police and that the town's only other police officer, Donnie Jones, had not yet graduated from the state police academy. Fuller did claim, however, that he had discussed the investigation with Jones. Jones, however, denied knowing anything about the investigation until after Fuller's arrest. Indeed, Jones testified that when he spoke with Fuller following his arrest, Fuller instructed him, "Get the story, everything -- everything straight. Get the story straight." Fuller said that he did not go to other authorities because he did not trust them or because he needed more concrete evidence before he could do so. Similarly, he did not tell his wife what he was doing. He answered her questions about why he was at the store all the time with the

3

explanation that he was "doing some work for the town, and [he] can't speak of it because it's, you know, investigative work."

Fuller freely testified at trial and acknowledged his role in the drug transactions but rested his defense on his claim that he was conducting a police-style undercover investigation into employee misconduct at Angler's Mini-Mart. He asserted that he had the authority as mayor to engage in such activities. Fuller argued further that he was not guilty of violating any federal drug laws because he "did not have the specific intent to commit those crimes."

In instructing the jury, the district judge stated, "[F]rom my own personal view I do not credit and accept the defendant's testimony that he was acting solely in his capacity as Mayor to investigate drug sales in his town of Vance, and that he had no intent to violate the federal drug laws." The district judge also stated that he believed that Fuller "was acting illegally as a drug dealer." Immediately after he made these comments to the jury, the judge admonished the jury that they "must not accept [his] view of the evidence" because the evaluation of the evidence was "entirely up to [the jury] and [the jury] alone." Fuller objected to the judge's comments and moved for a mistrial, which the court denied.

The jury found Fuller guilty on all four counts, and the district court sentenced him to 20 years imprisonment. This appeal followed.

II

Fuller's principal assignment of error is based on the district judge's expressing an opinion, while instructing the jury, about Fuller's credibility and his guilt for the crimes charged. In instructing the jury, the district judge included the following statement:

> As I said before and I repeat for emphasis' sake, it is entirely up to you jurors to determine what capacity, purpose and intent the defendant had when he made these four sales of crack cocaine to Paula Varner. Now, I do want to do something that I don't usually do in a case like this. . . . Now, this is a jury case, so it is not up to me to make the

4

decision in this case. But I did want to tell you-- and I don't usually do this, that from my own personal view <u>I do not credit and accept the defendant's testimony that he was acting solely in his capacity as the Mayor to investigate drug sales in his town of Vance, and that he had no intent to violate the federal drug laws. I believe he was acting illegally as a drug dealer.</u> Again, I emphasize to you that you do not -- you must not accept my view of the evidence in this case. It is entirely up to you and you alone to make your determination of what the evidence establishes. Do not accept my view of the evidence in this case.

(Emphasis added). Fuller not only objected to this instruction but moved for a mistrial, which the court denied. Fuller argues that the district judge was attempting to "persuade and influence the jury" and that this effort "violated the sacred and constitutional right that [Fuller] had to a fair, unbiased, and impartial jury who[ ] would decide how to apply the law to the facts in this case."

We agree with Fuller to the extent that we believe the district judge's statement was a most troubling one, creating unnecessary difficulties in preserving the appearance of impartiality before the jury.

Jury instructions serve the important function of informing the jury about its factfinding role, of instructing them on the law, and of informing the jury about its role in applying the law to the facts to determine the ultimate question of the defendant's guilt or innocence. See United States v. Gaudin, 515 U.S. 506, 514 (1995). The Constitution not only gives a criminal defendant a right to have the jury determine his guilt of every element of a crime for which he is charged, but also to have the trial before an impartial judge and jury. See id. at 522-23; Gray v. Mississippi, 481 U.S. 648, 668 (1987); Duncan v. Louisiana, 391 U.S. 145, 155-56 (1968).

But these principles do not prohibit a trial judge, in charging the jury, from commenting on the evidence, particularly to give context to the court's instructions on the law. The trial judge "is not limited to instructions of an abstract sort" and "may express his opinion upon the facts," provided he maintains his judicial demeanor and "makes

5

it clear to the jury that all matters of fact are submitted to their determination." <u>Quercia v. United States</u>, 289 U.S. 466, 469-70 (1933).

Moreover, "in exceptional cases," the Supreme Court has approved the trial judge's "express[ing] an opinion as to the guilt of the defendant." <u>United States v. Murdock</u>, 290 U.S. 389, 394 (1933). In the particular circumstances where the undisputed and admitted facts in a criminal case amounted to the commission of the crime defined by the statute, the Supreme Court held that it was not reversible error for the trial judge to have said to the jury, "I cannot tell you, in so many words, to find the defendant guilty, but what I say amounts to that." <u>Horning v. District of Columbia</u>, 254 U.S. 135, 138, 140 (1920) (majority opinion and Brandeis, J., dissenting). But where the facts are disputed and the evidence is more evenly balanced, it is error for the trial judge to give his opinion that "the Government has sustained the burden cast upon it by the law and has proved that this defendant is guilty in manner and form as charged beyond a reasonable doubt." <u>Murdock</u>, 290 U.S. at 393; <u>cf</u>. <u>Bihn v. United States</u>, 328 U.S. 633, 638 (1946). Furthermore, in every case where the trial judge's instruction has the effect of directing a verdict, the instruction is error, <u>see</u> <u>Gaudin</u>, 515 U.S. at 520-23, and to the extent that the Court's decision in <u>Horning</u> is read to approve an instruction through which the trial judge "effectively . . . order[s] the jury to convict," <u>Horning</u> amounts to an "unfortunate anomaly," <u>Gaudin</u>, 515 U.S. at 520.

In expressing an opinion about the guilt of the defendant -- a matter structurally committed to the jury for determination -- the trial judge tends to erode the parties' perception of impartiality and risks unduly influencing the jury. If it remains a permissible practice, a matter which is not certain in light of the Court's comments in <u>Gaudin</u>, it must be done most delicately so that the jury is left with the unmistakable understanding that it alone is to decide the defendant's guilt or innocence. Were we not left with the decision in <u>Horning</u>, which has not been overruled, we would be inclined to find the practice error. For this reason, we do not hold here that giving an opinion on the guilt or innocence of the defendant is <u>per se</u> error in every case, but we do not approve of the practice.

In the case before us, the trial judge did unfortunately express his opinion as to the guilt of the defendant when he said, "I believe he

6

was acting illegally as a drug dealer." But two factors save this trial from reversal. First, all of the facts required for conviction were admitted by the defendant during his testimony and were not controverted by any other evidence. The evidence included videotapes of Fuller selling crack cocaine to Varner, and Fuller himself testified that he did so on four separate occasions. Moreover, Fuller did not deny either that he knew the drugs he sold to Varner were crack cocaine or that he intended to sell them to Varner. Indeed, he testified that he wanted Varner to believe he was a drug dealer. Fuller thus admitted each essential element of conviction. See 21 U.S.C. § 841(a). His only defense was a legal one based on his alleged belief that, as mayor of Vance, he was authorized to sell the crack cocaine as part of his investigation. On this basis, he claimed that he never "intend[ed] to violate the criminal laws of the United States" because he lacked "the specific intent to commit those crimes." But it is not a requirement of 21 U.S.C. § 841(a) that the defendant have specifically intended to violate the statute in order to be found guilty. The mens rea required by the statute is that the defendant "knowingly or intentionally" engage in the prohibited activities. To act "knowingly" is to act with "knowledge of the facts that constitute the offense" but not necessarily with knowledge that the facts amount to illegal conduct, unless the statute indicates otherwise. Bryan v. United States, 118 U.S. 1939, 1946 (1998) (emphasis added). Since nothing in the text of 21 U.S.C. § 841(a) indicates that Congress meant to punish only those defendants who actually intended to violate the statute, Fuller's admission that he was aware that he was selling crack cocaine to Varner is all that was required to prove that his conduct was knowingly carried out. And to commit an act intentionally is to do so deliberately and not by accident. Fuller admitted that he deliberately sold the crack cocaine to Varner. Thus the exceptional circumstances present in Horning -- where the undisputed facts amounted to the commission of the crime -- are also present in this case.

The second factor saving this case from reversal is the district court's clear and repeated statements to the jury that the court's opinion concerning Fuller's guilt was only the judge's personal view and that the jury "must not accept [his] view of the evidence in this case." The trial judge reiterated, "Now, this is a jury case, so it is not up to me to make the decision in this case," and, "It is entirely up to you and you alone to make your determination of what the evidence estab-

7

lishes. Do not accept my view of the evidence in this case." These admonitions were given to the jury immediately preceding and following the judge's expression of opinion about Fuller's guilt, thereby making the judge's statements far less prejudicial than those in Horning, where the trial judge instructed the jury in effect to follow his opinion. The judge in Horning said, "a failure by you to bring in a verdict [of guilty] in this case can arise only from a wilful and flagrant disregard of the evidence and the law as I have given it to you, and a violation of your obligation as jurors." Thus, the very aspect of Horning that makes it "an unfortunate anomaly," Gaudin, 515 U.S. at 520, is not present in the case before us.

In short, while the district court's opinion concerning Fuller's guilt was, we believe, ill advised, in the exceptional circumstances of this case, we do not believe that it denied Fuller a fair trial. Compare Bihn, 328 U.S. at 638 (defendant was prejudiced by judge's statement implying she was guilty, where evidence was "quite evenly balanced" and "the jury might have been influenced by the erroneous charge"), and Quercia, 289 U.S. at 468, 472 (defendant who generally denied violating federal drug laws was prejudiced by judge's instruction to jury that wiping one's hands while testifying "is almost always an indication of lying").

III

Fuller also contends that the district court erred in instructing the jury that South Carolina law "d[oes] not authorize a mayor to commit violations of federal drug laws during the conduct of an investigation which he may be pursuing." The district court instructed the jury that Fuller's belief that he had the power, as mayor, to engage in undercover drug transactions as part of his investigation was a mistake of law which "is not a defense to the charges contained in this indictment." Fuller argues that this "amounted to a charge to the jury that the defendant had no defense . . . and was essentially a directed verdict."

We agree with the district court that Fuller's alleged belief that, as mayor, he was authorized under South Carolina law to conduct undercover drug operations amounted to a mistake of law and, as such, was not a legally cognizable defense to the federal charges against him.

8

Under South Carolina law, the mayor is "the chief administrative officer of the municipality." S.C. Code § 5-9-30 (emphasis added). As the chief administrative officer, the mayor is responsible for, among other things, making personnel decisions, managing the city's departments and offices, presiding at council meetings, and preparing the annual budget. Id. The mayor's various responsibilities also include the duty "to insure that all laws . . . subject to enforcement by him or by officers subject to his direction and supervision, are faithfully executed." S.C. Code § 5-9-30(4). But the only law enforcement power granted to mayors by South Carolina law is the power analogous to municipal judges to try persons charged with specified criminal offenses and, possibly, to investigate municipal departments. See S.C. Code §§ 5-7-90, 5-7-100. All other law enforcement activities, such as patrolling streets, making arrests, and conducting investigations, fall within the province of municipal police officers. See S.C. Code § 5-7-110 (stating that "Any municipality may appoint or elect as many police officers, regular or special, as may be necessary for the proper law enforcement in such municipality" and vesting municipal police officers with the "powers and duties" of constables). Most importantly, however, the primary responsibility for the enforcement of South Carolina's drug laws resides with the State Law Enforcement Division ("SLED"). See S.C. Code § 44-53-480.

Fuller has never claimed to have been acting either as a municipal police officer or as a SLED agent when he sold crack cocaine to Varner on four separate occasions. Instead, he claimed that he believed he was authorized, as mayor, to engage in the transactions as part of his investigation into alleged employee misconduct at Angler's Mini-Mart. But nothing in the South Carolina statutes or case law supports Fuller's belief that, as mayor, he possessed this law enforcement power. The best that Fuller can argue, if his testimony is found completely credible, is that his misunderstanding amounted to a mistake of law. But that mistake does not serve as a defense to the federal crimes with which he was charged.

While a mistake of fact can provide a defense to an offense that has a mens rea requiring knowledge, a mistake of law such as claimed by Fuller is no defense because the background presumption must be that "every citizen knows the law." Bryan, 118 S. Ct. at 1946. Without this presumption there could be little law enforcement because most citi-

9

zens are not knowledgeable about the law. "The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." Cheek v. United States, 498 U.S. 192, 199 (1991); see also United States v. Wilson, 133 F.3d 251, 261 (4th Cir. 1997).

Although not relied upon by Fuller, 21 U.S.C. § 885(d) immunizes "any duly authorized officer of any State . . . who shall be lawfully engaged in the enforcement of any law or municipal ordinance relating to controlled substances" from criminal prosecution under federal law for violations relating to controlled substances, including 21 U.S.C. § 841(a)(1). Since we conclude, however, that Fuller was not authorized under South Carolina law to engage in illegal drug transactions as part of his investigation, the immunity conferred by 21 U.S.C. § 885(d) does not apply.

Accordingly, the district court was correct in instructing the jury that Fuller's mistake of law defense could not serve as a defense to the federal crimes with which he was charged.

IV

Finally, Fuller argues that the district court erred in failing to instruct the jury on all sections of South Carolina Code § 5-9-30 concerning the powers and responsibilities of mayors. The district judge only instructed the jury on subsection (4), which authorizes mayors to ensure that all laws are enforced. Whether the entire statute was read, or only subsection (4), or indeed none of the statute, the district court correctly instructed the jury on Fuller's lack of authority. The decision of whether to give a particular jury instruction requested by a party remains in the discretion of the district court. See United States v. Abbas, 74 F.3d 506, 513 (4th Cir. 1996). Here, the district court did not abuse its discretion in refusing to give the instruction offered by Fuller. In any event, the portions of the statute omitted from the court's instructions dealt with the mayor's administrative functions and therefore were not relevant.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

10

LUTTIG, Circuit Judge, dissenting:

The district court instructed the jury in this case that it (the court) "did not credit and accept the defendant's testimony," that it (the court) believed that the defendant possessed the intent to violate the federal drug laws, and that it (the court) believed that the defendant "was acting illegally as a drug dealer." As the majority acknowledges, the district court essentially instructed the jury that the defendant was guilty as a matter of law.

Although I confess it was to my surprise, the Supreme Court has held that when the facts are undisputed and satisfy the elements of the crime, it is not necessarily reversible error for a trial court to instruct the jury that in the court's opinion the defendant is guilty. Horning v. District of Columbia, 254 U.S. 135, 138-39 (1920). See United States v. Murdock, 290 U.S. 389, 394 (1933). However, given the Court's considerably more recent explication of the doctrine of structural error, I must conclude that these holdings no longer constitute sound precedents.

In particular, in United States v. Gaudin, 515 U.S. 506 (1995), the Court, in a unanimous opinion written by Justice Scalia, left no doubt that it viewed both Horning and Murdock as irreconcilable with the Court's developing harmless error jurisprudence. Indeed, Justice Scalia characterized the doctrine of those cases-- that an instruction that the defendant was guilty as charged could be"harmless error, if error at all" -- as "an unfortunate anomaly in light of subsequent cases." Id. at 520. Other courts had reached the same conclusion even before Gaudin. See Commonwealth v. McDuffee, 398 N.E.2d 463, 468-69 (Mass. 1979) ("[S]erious constitutional questions are raised [by Horning] in light of modern case law."); United States v. Taylor, 693 F. Supp. 828, 841 n.25 (N.D. Cal. 1988) (agreeing with McDuffee).

It seems to me that the concern expressed in Gaudin applies even where, as here, the trial court instructs the jury that, notwithstanding the court's conclusion of guilt, the jury retains the right to make the final decision. For, as the Court explained in Quercia v. United States, 289 U.S. 466 (1933), on which Justice Scalia relied in Gaudin, "[t]he influence of the trial judge on the jury is necessarily and prop-

11

erly of great weight and his lightest word or intimation is received with deference, and may prove controlling." 289 U.S. at 470 (internal quotations omitted). Because of this influence, some errors in jury instructions -- those "likely to remain firmly lodged in the memory of the jury and to excite prejudice" -- simply cannot be cured by a statement that the court's opinions are not binding on the jury. Id. at 472. After Gaudin, an instruction of guilt surely falls into this class.

Because I believe that the Supreme Court, if confronted with the court's instruction in this case, would, under the reasoning of Gaudin, hold that the district court's instructional error was structural in character and thus "def[ies] analysis by harmless-error standards," Sullivan v. Louisiana, 508 U.S. 275, 281-82 (1993) (internal quotations omitted), I would reverse the defendant's conviction and remand for a new trial.

12