FILED
United States Court of Appeals
Tenth Circuit

April 4, 2016

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

ERIC LEO ALEXANDER,

     Defendant - Appellant.

No. 15-2086

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 2:14-CR-01656-KG-1)**

---

Stephen E. Hosford, Arrey, New Mexico, for Defendant-Appellant.

James R. W. Braun, Assistant United States Attorney, (Damon P. Martinez, United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **TYMKOVICH,** Chief Judge, **BRISCOE** and **MATHESON**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Defendant Eric Alexander was convicted by a jury of one count of failing to register under the Sex Offender Registration and Notification Act (SORNA), 18 U.S.C. § 2250(a).  Alexander now appeals.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291,

we reverse his conviction due to an erroneous and prejudicial jury instruction and remand for further proceedings.

# I

## *Factual background*

It is undisputed that Alexander is a sex offender as defined by federal law. That classification results from his October 2012 conviction in California state court for one count of lewd lascivious acts with a minor and one count of unlawful sexual intercourse. According to the record on appeal, these convictions stemmed from Alexander's unlawful sexual activities with two minor female relatives. ROA, Vol. III at 3 (Presentence Investigation Report (PSR)). Although Alexander was sentenced to a total term of imprisonment of four years for these offenses, he was released on parole on December 1, 2012.[1]

After being paroled, Alexander registered as a sex offender in the City of Santa Ana, California. In doing so, Alexander did not list a fixed address and instead registered as a transient. Though registering as a transient required Alexander to "re-register every [thirty] days," it is undisputed that Alexander failed to do so. Id. Vol. IV at 160.

On April 3, 2013, Alexander "violated the conditions of his parole by absconding from parole supervision, having access to a firearm, [providing] false identification to a police officer, and [having] access to ammunition or [a] firearm." Id. Vol. III at 11. On

---

[1] It appears from the record that Alexander spent a significant amount of time in custody between the time of his arrest on these charges and the time he pleaded guilty to the charges. ROA, Vol. III at 11.

August 28, 2013, Alexander committed additional violations "by absconding from parole supervision and" failing to re-register as a sex offender. Id.

On September 5, 2013, Alexander traveled by bus to Las Cruces, New Mexico. A Las Cruces resident named Cynthia Williams picked up Alexander from the bus station and took him to her apartment. According to Williams, she first met Alexander in June 2013 (the record does not indicate where they met) and "thought something would work out between [them]." Id. Vol. IV at 128. Although Williams was aware that Alexander had a criminal history, she did not know the precise details of it.

Alexander proceeded to stay at Williams' apartment from the day of his arrival in Las Cruces on September 5, 2013, until his subsequent arrest on September 23, 2013. At no time during that period did Alexander stay anywhere else. According to Williams, Alexander talked about traveling to Corpus Christi, Texas, to visit his daughter and he asked Williams to text his daughter's aunt, who lived with Williams' daughter and served as her caretaker, to ask for money to help him travel to Corpus Christi. The aunt purportedly gave Alexander forty dollars. His uncle also testified Alexander asked him and Alexander's father for money to buy a bus ticket. Nonetheless, Alexander never made a serious attempt to go to Corpus Christi. In particular, he did not purchase or attempt to purchase any type of ticket to travel there.

According to Williams, Alexander arrived in Las Cruces with only a backpack of clothing and personal items. Alexander kept these items at Williams' apartment during the period of time he was in Las Cruces. Alexander also used cash to help purchase food

3

for Williams' home.

Leticia Bullard, Williams' sister, lived in the same apartment complex and encountered Alexander several times during the time he was staying at Williams' apartment. According to Bullard, she first saw Alexander at her sister's apartment on September 7, and saw him numerous times thereafter during the ensuing weeks. She also observed Alexander "in different outfits or change[s] of clothing" on the different dates that she saw him there. Id. at 124.

On approximately September 17, 2013, Bullard learned about Alexander's status as a sex offender. She then contacted a law enforcement officer. That in turn led to officers from the United States Marshals Service arresting Alexander at Williams' apartment complex on September 23, 2013, for parole violations.

*Procedural background*

On January 3, 2014, a criminal complaint was filed against Alexander in federal district court in New Mexico charging him with one count of failing to register under SORNA, 18 U.S.C. § 2250(a). On May 14, 2014, a federal grand jury indicted on the same charge.

The case proceeded to trial before a jury on September 15, 2014. At the conclusion of the two-day trial, the jury found Alexander guilty of the single charge listed in the indictment. Alexander was subsequently sentenced to a term of imprisonment of forty-six months, to be followed by a five-year term of supervised release.

**II**

4

Alexander challenges both his conviction and sentence on appeal. As outlined below, we reach only the two issues that pertain to his conviction. Although we conclude that the government's evidence was sufficient to support Alexander's conviction under the less demanding standards contained in the instructions given, we conclude that the jury was improperly instructed and that the error was prejudicial when viewed in light of the entire record.[2] We therefore reverse his conviction and remand for further proceedings. Consequently, we do not reach the issues raised by Alexander relating to his sentence.

*Sufficiency of the evidence*

Alexander argues that the evidence presented at trial was insufficient to support his conviction. "'We review the denial of a motion for judgment of acquittal, and hence the sufficiency of the evidence to support the jury verdict, de novo.'" United States v. Rodella, 804 F.3d 1317, 1323 (10th Cir. 2015) (quoting United States v. Sparks, 791 F.3d 1188, 1190 (10th Cir. 2015)). In doing so, "'we view the evidence in the light most favorable to the government to determine whether a rational trier of fact could have found the elements of the offense beyond a reasonable doubt.'"[3] Id. (quoting Sparks, 791 F.3d

_____

[2] Were Alexander successful in his challenge to the sufficiency of the evidence, he would be entitled to an acquittal. Hence our reason for addressing the sufficiency issue prior to our addressing his challenge to the jury instructions.

[3] Alexander's counsel moved for a judgment of acquittal at the close of the government's case, but failed to renew that motion at the close of all the evidence. ROA Vol. 4 at 177-78. In similar situations, we have "sometimes used" plain-error language. United States v. Cox, 929 F.2d 1511, 1514 (10th Cir. 1991). But "the standard actually applied is 'essentially the same as if there had been a timely motion for acquittal'" at the

at 1190-91).

Alexander was convicted of violating 18 U.S.C. § 2250(a). That statute provides, in pertinent part, that "[w]hoever . . . is required to register under [SORNA]," "travels in interstate . . . commerce," and "knowingly fails to register or update a registration as required by [SORNA] . . . shall be fined under this title or imprisoned not more than 10 years, or both." 18 U.S.C. § 2250(a)(1), (3). SORNA requires "[a] sex offender" to "register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student." 42 U.S.C. § 16913(a). In terms of keeping a registration current, SORNA states, in pertinent part:

> A sex offender shall, not later than 3 business days after each change of . . . residence . . . , appear in person in at least 1 jurisdiction involved pursuant to subsection (a) of this section and inform that jurisdiction of all changes in the information required for that offender in the sex offender registry. That jurisdiction shall immediately provide that information to all other jurisdictions in which the offender is required to register.

42 U.S.C. § 16913(c).

It is undisputed that Alexander, due to his prior California state convictions, qualifies as a "sex offender" under SORNA. See 42 U.S.C. § 16911(a) (defining "sex offender" as "an individual who was convicted of a sex offense"). It is, in turn, undisputed that Alexander is subject to SORNA's registration requirements. The only

close of all the evidence. Id. (quoting United States v. Bowie, 892 F.2d 1494, 1497 (10th Cir. 1990)). Thus, Alexander's "waiver of his objection to the [district] court's denial of [his initial] motion for judgment of acquittal does not alter our standard of review, which remains an independent review of the legal question of sufficiency." Id.

disputed issue in this case is whether Alexander knowingly failed to comply with SORNA's registration requirements when he traveled to Las Cruces and stayed with Williams. More specifically, the question is whether the evidence presented by the government at trial would have allowed the jury to find beyond a reasonable doubt that Alexander "change[d]" his "residence" by traveling to Las Cruces and staying in Williams' apartment. If the government's evidence was sufficient in this regard, then the jury could reasonably have found Alexander guilty of violating § 2250(a) because it is uncontroverted that he did not attempt to inform New Mexico state authorities, or any other authorities for that matter, of his change in residence.

Alexander concedes that the government's evidence established that "he was present in [Las Cruces] for a period of three weeks." Aplt. Br. at 8. But, Alexander argues, "no witness testified of his intent to remain in New Mexico." Id. "To the contrary," he asserts, "the testimony supports that he was trying to travel to Texas" to see his daughter. Id. And, he argues, "Williams . . . testified that she did not consider that [he] had moved into her apartment." Id.

In determining whether there was sufficient evidence to support Alexander's conviction of violating § 2250(a), we review the evidence presented in the light most favorable to the government. Rodella, 804 F.3d at 1323. Addressing Alexander's arguments in reverse order, we conclude that Williams' testimony that Alexander had not "moved in" with her could have been reasonably ignored or discredited by the jury, given Williams' admission that she was involved in a romantic relationship with Alexander.

7

Moreover, the circumstantial evidence, particularly when viewed in the light most favorable to the government, was contrary to Williams' statement. In particular, it was undisputed that Alexander was living in southern California as a transient immediately prior to traveling to Las Cruces. Further, it was undisputed that Alexander did not obtain approval from his parole officer to leave California or otherwise inform his parole officer about his intentions. It was also undisputed that Williams, who was interested in pursuing a romantic relationship with Alexander, picked him up at the Las Cruces bus station on September 5, 2013, took him to her apartment, and he stayed there and no where else until the time of his arrest on September 23, 2013. During the period that Alexander was at Williams' apartment, it is undisputed that he kept all of his personal belongings there, including his clothing, and assisted in purchasing food for the apartment. Although Alexander apparently expressed an interest in traveling to Texas to see his daughter, there is no evidence that he made any serious attempts to actually do so. Further, while Alexander contends that he simply traveled to New Mexico en route to Texas, there is no evidence that he intended to live in Texas with or near to his daughter. Considered together, we conclude that this evidence was sufficient to allow a jury to reasonably find, beyond a reasonable doubt, that Alexander either intended to make Williams' apartment his home or, alternatively, habitually lived with Williams (i.e., lives with some regularity, as defined by Instruction No. 10) and had thus effectively changed his residence for purposes of SORNA, thereby triggering his duty to update the sex offender registry.

Thus, in sum, we conclude that the evidence presented by the government at trial

was sufficient to support Alexander's conviction as charged and instructed.

*Jury instructions*

Alexander also argues that the district court erred in denying two of his requested jury instructions. "[W]e consider the refusal to give a requested jury instruction under the abuse-of-discretion standard." United States v. Kupfer, 792 F.3d 1226, 1229 (10th Cir. 2015). "In order to assess whether the court properly exercised its discretion, we review the jury instructions de novo to determine whether, as a whole, they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case." Rodella, 804 F.3d at 1329 (internal quotation marks omitted).

Alexander's Proposed Instruction No. 9 stated as follows:

The Sex Offender Registration and Notification Act requires a sex offender to report a change of name, residence, employment or student status within three days after any such change. The report must be provided to the state(s) where the offender resides, works, or is a student.

The term resides means, with respect to an individual, the location of the individual's home or other place where the individual habitually lives.

ROA, Vol. I at 30. Alexander's Proposed Instruction No. 10, in turn, stated as follows:

The term habitually lives means any place where a sex offender intends to make his home, or in which he lives for at least 30 days.

Id. at 31. These proposed instructions were derived from language contained in "[t]he National Guidelines for Sex Offender Registration and Notification" issued by the Office of the Attorney General of the United States (SORNA Guidelines), 73 Fed. Reg. 38,030

9

(July 2, 2008).

The government objected to Alexander's Proposed Instruction No. 10, arguing that it was misleading. More specifically, the government argued that Proposed Instruction No. 10 erroneously suggested, contrary to the SORNA Guidelines, that "a sex offender does not have to register until he lives at a place for at least 30 days." ROA, Vol. I at 45.

At the instruction conference, Alexander's counsel argued that the district court "needed to define the term 'habitually lives' as well as the term 'resides.'" Id. Vol. IV at 14. The district court stated in response, "Well, we can certainly add that, and I'm prepared to do exactly that, which is to define 'resides' and define 'habitually lives' in separate instructions to clarify . . . what that all means within the scope of SORNA." Id. The district court in turn explained that it intended to rely on the instructions that were at issue in the Fifth Circuit's decision in United States v. Wampler, 703 F.3d 815 (5th Cir. 2013). Id. Alexander's counsel again objected, arguing that those instructions omitted any reference to "living in a place for at least 30 days." Id. at 17 (internal quotation marks omitted). The district court in turn responded, "I think looking at that regulation in the context, I think the clear meaning is he has to register within three days" and "waiting until 30 days would almost emasculate the purposes of SORNA, where we've kind of lost track of him for as many as 30 days, and I don't think that's the intention of the statute." Id. at 18. Consequently, the district court overruled the objection. Id.

The district court ultimately instructed the jury as follows with regard to SORNA's registration requirements:

Jury Instruction No. 9

The Sex Offender Registration and Notification Act requires a sex offender to report a change of name, residence, employment, or student status within three days after any such change. The report must be provided to the state(s) where the sex offender resides, works, or is a student.

To change something means to make different from what it is; or to substitute one thing for another. One's residence is defined as where one resides or maintains his home. The term resides means location of the individual's home or other place where the individual habitually lives. A change in residence does not require that you find that the Defendant has established a new residence. Rather, it is enough for you to find that the Defendant's home or other place where he habitually lives is no longer the same as the one listed in the registry.

ROA, Vol. I at 88.


Jury Instruction No. 10

Places where a person "habitually lives" includes places in which that person lives with some regularity, not just the place that the person calls his home address or place of residence. A person may reside in more than one place and must include in his registration each place where he resides.

Id. at 89.

On appeal, Alexander argues that Instruction No. 10, by failing to include any "reference to the 'makes a home' standard" or "the '30 days' standard," did not "accurately inform the jury of the governing law." Aplt. Br. at 11. As a result, he argues, "the jury was left to speculate as to the meaning of 'lives with some regularity'[] and reached a conclusion that . . . Alexander was habitually living in New Mexico, notwithstanding that the evidence showed that he was travelling [sic] to Texas and had

11

been in New Mexico less than 30 days."  Id.

To fully address Alexander's arguments, we turn first to the language of SORNA.

SORNA requires, in pertinent part, that a sex offender "keep [his] registration current, in

each jurisdiction where the offender resides."  42 U.S.C. § 16913(a).  As it pertains to this

continuing registration requirement, SORNA states that "[t]he term 'resides' means, with

respect to an individual, the location of the individual's home or other place where the

individual habitually lives."  42 U.S.C. § 16911(13).  And, as previously noted, SORNA

imposes the following continuing registration requirements:

> A sex offender shall, not later than 3 business days after each change of . . .
> residence . . . , appear in person in at least 1 jurisdiction involved pursuant
> to subsection (a) of this section and inform that jurisdiction of all changes in
> the information required for that offender in the sex offender registry.  That
> jurisdiction shall immediately provide that information to all other
> jurisdictions in which the offender is required to register.

42 U.S.C. § 16913(c).

Congress directed the Attorney General to "issue guidelines and regulations to

interpret and implement [SORNA]."  42 U.S.C. § 16912(b).  The Attorney General did so

by issuing the SORNA Guidelines.  The SORNA Guidelines state, in discussing "[t]he

notion of 'residence'," that "a sex offender must register: [1] [i]n any jurisdiction in

which he has his home; and [2] [i]n any jurisdiction in which he habitually lives (even if

he has no home or fixed address in the jurisdiction, or no home anywhere)."  73 Fed. Reg.

at 38,061.  The SORNA Guidelines further state:

> The scope of "habitually lives" in this context is not self-explanatory and
> requires further definition.  An overly narrow definition would undermine

12

the objectives of sex offender registration and notification under SORNA. For example, consider the case of a sex offender who nominally has his home in one jurisdiction—e.g., he maintains a mail drop there, or identifies his place of residence for legal purposes as his parents' home, where he visits occasionally—but he lives most of the time with his girlfriend in an adjacent jurisdiction. Registration in the nominal home jurisdiction alone in such a case would mean that the registration information is not informative as to where the sex offender is actually residing, and hence would not fulfill the public safety objectives of tracking sex offenders' whereabouts following their release into the community.

"Habitually lives" accordingly should be understood to include places in which the sex offender lives with some regularity, and with reference to where the sex offender actually lives, not just in terms of what he would choose to characterize as his home address or place of residence for self-interested reasons. The specific interpretation of this element of "residence" these Guidelines adopt is that a sex offender habitually lives in the relevant sense in any place in which the sex offender lives for at least 30 days. Hence, a sex offender resides in a jurisdiction for purposes of SORNA if the sex offender has a home in the jurisdiction, or if the sex offender lives in the jurisdiction for at least 30 days. Jurisdictions may specify in the manner of their choosing the application of the 30-day standard to sex offenders whose presence in the jurisdiction is intermittent but who live in the jurisdiction for 30 days in the aggregate over some longer period of time. Like other aspects of SORNA, the requirement to register sex offenders who "reside" in the jurisdiction as defined in [42 U.S.C. § 16911(13)] is a minimum requirement, and jurisdictions in their discretion may require registration more broadly (for example, based on presence in the jurisdiction for a period shorter than 30 days).

As to the timing of registration based on changes of residence, the understanding of "habitually lives" to mean living in a place for at least 30 days does not mean that the registration of a sex offender who enters a jurisdiction to reside may be delayed until after he has lived in the jurisdiction for 30 days. Rather, a sex offender who enters a jurisdiction in order to make his home or habitually live in the jurisdiction must be required to register within three business days, as discussed in Part X.A of these Guidelines.

Id. at 38,061-62.

13

Returning to the district court's instructions, we are not persuaded that they were erroneous for failing to include the phrase "make his home." To be sure, the SORNA Guidelines employ that precise phrase. But the district court's Instruction No. 9 utilizes the substantially similar phrase "maintains his home." As a result, we conclude that Instruction No. 9 provided the jury with an accurate understanding of the relevant legal standard and was not erroneous as alleged by Alexander.

We conclude, however, that the district court's Instruction No. 10, which purported to define the phrase "habitually lives," failed to provide the jury with the complete definition of that phrase, as outlined in the SORNA Guidelines. More specifically, the district court's Instruction No. 10 failed to inform the jury "that a sex offender habitually lives in the relevant sense in any place in which the sex offender lives for at least 30 days." 73 Fed. Reg. at 38,062. Although the district court was rightly concerned that the thirty-day standard should not be construed to mean that a sex offender's registration duty could be delayed until the end of the thirty-day period, that was not a valid basis for omitting from its instructions any reference to the thirty-day standard.[4] Indeed, to do so arguably could lead a jury to find even in the absence of intent that some lesser period is sufficient to satisfy the "habitually lives" standard. And,

[4] The government argues in its appellate response brief that Alexander's proposed Instruction No. 10 "was not an accurate statement of the law" because it failed to explain that a sex offender may not delay his registration until after he has lived in a new jurisdiction for thirty days. Aplee. Br. at 18. Any concern about potential jury confusion could have been obviated by inserting relevant language from the SORNA Guidelines emphasizing that the thirty-day standard does not override the three-day registration requirement.

14

although the district court apparently took comfort in the fact that the instructions it utilized had been affirmed by the Fifth Circuit in Wampler, the Fifth Circuit emphasized in that case that it was not "decid[ing] whether the district court's omission of the thirty-day standard was erroneous, because [the defendant] made no argument on that basis in the district court or on appeal." 703 F.3d at 820 n.2.

In United States v. Thompson, 811 F.3d 717 (5th Cir. 2016), the Fifth Circuit recently addressed the interplay in the SORNA Guidelines between "changes of residence" and "habitually lives." The defendant in that case argued that since he had not resided at a new location for thirty days, he qualified for what he argued was a "safe harbor" under the SORNA Guidelines. The Fifth Circuit rejected this argument because, it noted, the SORNA Guidelines require a sex offender who changes his place of residence to report the change within three business days. The Fifth Circuit further concluded that, under the SORNA Guidelines, because the defendant abandoned his residence in one city and relocated to another city, he was therefore "'required to report the change within three business days.'" 811 F.3d at 730 (quoting 73 Fed. Reg. at 38,062).

These same registration requirements apply in the case at bar. If the jury finds that Alexander intended to make Williams' apartment his home or intended to "habitually live" at Williams' apartment (i.e., that Alexander intended to live at Williams' apartment for thirty days or more), then it would necessarily have to find that he violated SORNA because it is undisputed that he did not register within three business days after arriving in

15

Las Cruces.

Having concluded that Instruction No. 10 erroneously failed to include any reference to the thirty-day standard, we must determine whether the error was harmless. Given that the error at issue is constitutional (since it involved the omission or wrongful description of an element), we must determine "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Neder v. United States, 527 U.S. 1, 15 (1999) (quotation marks omitted); United States v. Sorensen, 801 F.3d 1217, 1229-30 (10th Cir. 2015) (applying harmless error standard to erroneous instruction).

The key, and indeed only, question at trial was whether Alexander changed his residence when he traveled to Las Cruces and stayed in Williams' apartment from the time of his arrival until the time of his arrest approximately eighteen days later. To find that these actions constituted a change of Alexander's residence for purposes of SORNA, the jury had to find either (1) that Alexander intended for Williams' apartment to become his home, or (2) that Alexander habitually lived at Williams' apartment. See 42 U.S.C. § 16911(13) (defining "resides"). Because the district court employed a general verdict form, however, it is impossible to determine which basis the jury actually relied upon in finding Alexander guilty. ROA, Vol. I at 106.

Although the government's evidence would have allowed the jury to reasonably find either of these bases had it been properly instructed, the problem is that, due to the instructional error we have identified, we cannot determine the basis for the jury's

16

verdict. If the jury based its verdict on Alexander habitually living at Williams'

apartment, as it was instructed the jury was not required to find that Alexander intended

to live at Williams' apartment for thirty days or more in order to find him guilty on that

basis. In other words, the instructions left the jury without a complete definition of the

phrase "habitually live." See Griffin v. United States, 502 U.S. 46, 59 (1991) ("When . . .

jurors have been left the option of relying upon a legally inadequate theory, there is no

reason to think that their own intelligence and expertise will save them from that error.");

McCormick v. United States, 500 U.S. 257, 275 (1991) (reaching similar conclusion in

Hobbs Act case involving erroneous jury instructions). As a result, we are unable to

conclude that the district court's instructional error was harmless beyond a reasonable

doubt.

For these reasons, it is necessary for us to reverse the judgment of the district court

and remand for further proceedings. Should retrial be pursued on remand, the instruction

that the district court gave regarding SORNA in Instruction No. 9 correctly states the law

as set forth in 42 U.S.C. § 16913(c), the SORNA Guidelines, and as supported by our

decision in United States v. Murphy, 664 F.3d 798, 801 (10th Cir. 2011) (discussing the

meaning of a change in residence for purposes of SORNA). As regards to Instruction No.

10, to better reflect the meaning of "habitually lives" and the duty to promptly update the

sex offender registry, the following language, which is derived from the SORNA

Guidelines, should be used as a guide:

An offender "habitually lives" in any place in which he intends to live with

17

> some regularity, or lives for at least 30 days, even if the person has no home or fixed address or is homeless.
>
> The understanding of "habitually lives" to mean living in a place for at least 30 days does not mean the offender may delay updating his registration for 30 days if he intends to lives with some regularity at the residence.

See 73 Fed. Reg. at 38,062.

## III

The judgment of the district court is REVERSED and the case REMANDED for further proceedings consistent with this opinion.

18